Lori JOHNS, Respondent,

v.

HARBORAGE I, LTD., a/k/a America
Live, a foreign limited partnership,
et al., Appellants.

No. C8-98-301.

Court of Appeals of Minnesota.

Nov. 17, 1998.

James F. Baldwin, H. Le Phan, Murnane, Conlin, White & Brandt, St. Paul, MN, for appellants.

William J. Morris, Jr., Frank Vogl, Best & Flanagan, P.L.L.P., Minneapolis, MN, for respondent.

Considered and decided by TOUSSAINT, C.J., and DAVIES and PETERSON, JJ.

## OPINION

PETERSON, Judge.

In this appeal from a judgment, appellant Harborage I, Ltd., argues that the trial court erred by awarding respondent Lori Johns compensatory and punitive damages for emotional harm caused by the hostile work environment maintained by appellant at Gators Bar and Grill. Appellant also challenges an award for costs and attorney fees. We affirm in part and reverse in part.

## FACTS

From January to March 25, 1993, respondent Lori Johns worked as a server, hostess, and cashier at Gators Bar and Grill in the Mall of America (Gators). Harborage I, Ltd. (Harborage I), a Texas limited partnership, managed Gators and several other bars at the Mall of America. Harborage, Inc., a Texas corporation, provided employees for Gators. FPM, Ltd., a Texas limited partnership, was the lessee of Gators' premises and held the liquor license for the premises.

On February 23, 1993, while working as a hostess at Gators, Johns was approached by Michael Long, another Gators employee, who told her that her shorts were not "tight enough" and did not conform to Gators's dress code. Long told Johns that the appropriate shorts were in a storage closet behind the hostess stand. Johns followed Long into the storage closet and followed his request to shut the door. While in the closet, Long took off his shorts and exposed his erect penis to Johns. Long then told Johns to change her shorts in front of him. When Johns refused, Long forcibly pulled down her shorts, exposing her buttocks. Johns slapped Long's hand and told him to stop. Long attempted to pull down Johns's shorts a second time before she fled from the storage closet.

Gators's assistant manger, Michelle Johnson, saw Long and Johns leaving the storage closet and noticed that Johns looked upset and Long looked guilty. Johnson spoke to Johns and learned that Long had exposed himself to Johns in the storage closet. The next day, Johnson reported the incident to Steve Buchanan, Gators's general manager. After speaking with Johns, Buchanan contacted Long and suspended him pending the outcome of the investigation into Johns's complaint.

Buchanan interviewed the Gators staff and discovered that prior to the incident with Johns, Long had harassed other female employees. Long had exposed himself to R. S., a Gators server, during work hours. On separate occasions, Long attempted to pull down coworker K.M.'s shorts and groped her breasts. Long engaged in offensive conduct against another coworker, K.B., on several occasions. This conduct included pulling down K.B.'s shorts, pinching her buttocks, and following her into the women's restroom where he exposed his penis to her through his tight spandex shorts. These employees did not welcome Long's conduct and were offended by it, but they did not report these incidents to management. Buchanan also asked Johnson if Long had ever directed any sexual misconduct toward her, and Johnson denied that he had.

Based on his investigation, Buchanan met with Long intending to terminate his employment. However, Long said he wanted to

quit, and Buchanan accepted that. Long's personnel file states that he quit for personal reasons.

Johns filed a criminal complaint against Long with the Bloomington Police Department. Long was charged with gross-misdemeanor indecent exposure and pleaded guilty to an amended charge of misdemeanor indecent exposure.

On March 25, 1993, Johns resigned from her position at Gators. On January 14, 1994, Johns filed unlawful discrimination charges with the Equal Employment Opportunity Commission (EEOC) and the Minnesota Human Rights Department (MHRD). In June 1995, the EEOC issued Johns a right-to-sue notice. In September 1995, Johns brought an employment discrimination action against Harborage, Inc., seeking compensatory and punitive damages for claims based on (a) sexual harassment—hostile work environment; (b) retaliation; (c) negligent hiring; (d) negligent supervision; (e) negligent retention; and (f) respondeat superior.

Harborage I answered Johns's complaint and admitted that it was Johns's employer. During discovery, Johnson was deposed and admitted that Long had engaged in sexually offensive conduct toward her. Johnson stated that during work hours at Gators, Long pulled out the front of his spandex shorts and asked her if she wanted to feel his penis. Johnson stated that she did not invite nor welcome this conduct, and she was offended by Long's actions. Johnson also stated that despite being Long's supervisor, she only reprimanded him and told him that his behavior was inappropriate.

In July 1996, at the request of defense counsel, Johns amended her complaint to substitute Harborage I for Harborage, Inc., as the defendant. In August 1996, Harborage I moved for summary judgment. The trial court granted partial summary judgment and dismissed Johns's respondeat superior, negligent hiring, negligent supervision, and negligent retention claims. The court denied summary judgment with respect to Johns's hostile work environment and retaliation claims.

In October 1996, defense counsel advised Johns that Harborage, Inc., not Harborage I, was her employer at the time she was sexually harassed by Long. By stipulation, Johns's complaint was amended to substitute Harborage, Inc., for Harborage I, as the defendant. But after Harborage, Inc., filed for bankruptcy protection in November 1996, Johns moved to amend her complaint to reinstate Harborage I as a defendant and to add FPM as a defendant. The trial court granted Johns's motion, but reserved the issue of whether Harborage I and FPM were Johns's employers.

Following a bench trial, the court found that Harborage I was the manager of Gators and was Johns's employer under Title VII and the Minnesota Human Rights Act (MHRA). The court concluded that Harborage I unlawfully discriminated against Johns by subjecting her to a hostile work environment based upon sex and awarded her $25,000 in compensatory damages, $8,500 in punitive damages, and reasonable attorney fees. The court dismissed Johns's retaliation claim and all claims against FPM.

Harborage I moved to amend the findings of fact, conclusions of law, and order for judgment or, in the alternative, for a new trial. The trial court denied the motion and awarded Johns $65,894.46 for costs and attorney fees.

## ISSUES

I. Did the trial court err in finding that Harborage I was John's employer under Title VII and the Minnesota Human Rights Act?

II. Was Johns precluded from pursuing a Title VII claim and a Minnesota Human Rights Act claim against Harborage I because she failed within the statutory limitations period to name Harborage I in her EEOC charge and her subsequent civil action?

III. Did the trial court err in concluding that Harborage I unlawfully discriminated against Johns by subjecting her to a hostile work environment?

IV. Did the trial court err in awarding Johns $25,000 in compensatory damages?

V. Did the trial court err in awarding Johns $8,500 in punitive damages?

VI. Did the trial court err in awarding John's $65,894.46 for costs and attorney fees?

## ANALYSIS

Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn. R. Civ. P. 52.01.

■ The decision to grant a new trial lies within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Halla Nursery, Inc. v. Baumann–Furrie & Co.*, 454 N.W.2d 905, 910 (Minn.1990). Where the trial court exercises no discretion, but instead, bases its order on an error of law, this court's review is de novo. *Id.*

On appeal from a denial of a motion for a new trial, the verdict must stand unless it is manifestly and palpably contrary to the evidence, viewed in a light most favorable to the verdict.

*ZumBerge v. Northern States Power Co.*, 481 N.W.2d 103, 110 (Minn.App.1992), *review denied,* (Minn. Apr. 29, 1992).

### I.

■ The trial court concluded that both Harborage I and Harborage, Inc., could be treated as Johns's employer under Title VII because the two entities were

so interrelated in their operations, common management, common ownership and financial control, and in their centralized control of labor relations as to be a simple integrated enterprise.

Harborage I argues that the trial court's conclusion is contrary to law and unsupported by the evidence.

[I]n determining whether two entities may be liable as a single employer under Title VII two basic approaches have been taken. The first * * * rests upon a finding that the two entities constitute a single or joint employer. The second rests on a finding

that one entity * * * is merely the agent or instrumentality of the other.

*Equal Employment Opportunity Comm'n v. Wooster Brush Co.*, 727 F.2d 566, 571 (6th Cir.1984) (citations & footnote omitted).

■ To determine whether separate entities should be consolidated under the first approach, the factors that should be applied are (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 392 (8th Cir.1977). The presence of any single factor in the Title VII context is not conclusive and all four criteria need not be present in all cases. *Armbruster v. Quinn*, 711 F.2d 1332, 1337–38 (6th Cir. 1983). The third factor, centralized control of labor relations, is the most important of the four factors. *Fahey v. Avnet, Inc.*, 525 N.W.2d 568, 572 (Minn.App.1994), *review denied* (Minn. Feb. 14, 1995).

The showing required to warrant a finding of single-employer status has been described as "highly integrated with respect to ownership and operations.". *Fike v. Gold Kist, Inc.*, 514 F.Supp. 722, 726 (N.D.Ala.1981), *aff'd,* 664 F.2d 295 (11th Cir.1981). The test may also be satisfied by a showing that there is an amount of "participation [that] is sufficient and necessary to the total employment process," even absent "total control or ultimate authority over hiring decisions." *Rivas v. State Board for Community Colleges & Occupational Educ.*, 517 F.Supp. 467, 470 (D.Colo.1981).

*Armbruster*, 711 F.2d at 1338 (citations omitted) (alteration in original).

The evidence is sufficient to demonstrate that the operations of Harborage I and Harborage, Inc., were interrelated. Harborage I managed Gators, and Harborage, Inc., provided employees for Gators. Harborage, Inc., issued Johns's paychecks. Many of the personnel forms used at Gators simply read "Harborage" without any further designation. Performance evaluations for some Gators employees are on Harborage I forms. Harborage I applied to the Minnesota Assigned Risk Plan for workers' compensation insurance and the issued policy was amended

to list Harborage, Inc., as the employer. Harborage I is also known as "America Live," and Johns's exit interview form lists as her employer "America Live." When Johns's complaint was amended to substitute Harborage, Inc., for Harborage I, James Balvin remained as the attorney representing the defendant.

More significantly, the sexual harassment policy form that Johns signed when she was hired was printed on Harborage, Inc., letterhead and directed employees who experience sexual harassment to contact the director of personnel. However, Harborage, Inc., did not have a director of personnel. Instead, the corporate director of human resources for Harborage I handled employee complaints about harassment.

Finally, in its original answer to Johns's complaint, Harborage I admitted that it was Johns's employer and responded to the complaint as if it were her employer. This indicates that the operations of Harborage I and Harborage, Inc., were so deeply interrelated that not even the entities themselves knew which of them was the employer.

At issue in the second factor, common management, is whether the same individuals manage and control the two entities. *Fahey*, 525 N.W.2d at 572. Harborage, Inc., and Harborage I were managed by the same individuals. Harborage, Inc., was formed in 1986. A separate entity, Harborage Services, Inc., was formed in 1991; its directors were Joyce O. McReynolds, Leon Carroll, and Lezlee Ann Williams. When Harborage I was formed as a limited partnership in 1991, its general partner was Harborage Services, Inc., and its limited partner was Harborage, Inc. Leon Carroll signed the Harborage I limited partnership agreement as president of Harborage Services, Inc., and as president of Harborage, Inc. When Harborage, Inc., transferred its limited partner interest in Harborage I to another entity in 1995, Joyce O. McReynolds signed the amendment to the limited partnership agreement as president of Harborage Services, Inc., the general partner, as president of Harborage, Inc., the withdrawing limited

partner, and as president of the incoming limited partner.

These findings demonstrate that at different times, Leon Carroll and Joyce O. McReynolds each served simultaneously as president of Harborage, Inc., the limited partner of Harborage I, and as president of the general partner of Harborage I. In their capacities as president of Harborage, Inc., Carroll and McReynolds managed Harborage, Inc., and in their capacities as president of Harborage I's general partner, Carroll and McReynolds managed Harborage I.

In addition, the trial court found that in 1994, Harborage, Inc., established a 401(k) plan for its employees. The plan lists Joyce O. McReynolds as president and trustee. In 1996, the plan was amended to change the name of the plan from Harborage, Inc., 401(k) Plan to Harborage I, Ltd., 401(k) Plan and to change the name of the employer from Harborage, Inc., to Harborage I, Ltd. Joyce McReynolds signed the amendment as president and trustee. This is further evidence that the same individual managed Harborage, Inc., and Harborage I.

The evidence also demonstrates that there was centralized control of labor relations for Harborage, Inc., and Harborage I. In a July 31, 1995, letter written on Harborage I letterhead, Barbara J. Coyne identifies herself as director of human resources. In the letter, which was sent to Johns's attorney, Coyne acknowledges that Johns's EEOC complaint was investigated and the results were reported to the EEOC. Coyne states that "our" obligation to take action on the complaint was satisfied and that "Sexual Harassment is a matter we take very seriously at our company." Coyne also states that the sexual harassment policy statement that Johns signed[1] clearly directs employees to contact her in the event they experience harassment.

Coynes's letter demonstrates that that there was centralized control of labor relations for Harborage, Inc., and Harborage I because it indicates that as director of human resources for Harborage I, Coyne was responsible for handling sexual harassment

1. This policy statement was printed on Harborage, Inc., letterhead.

complaints made by employees of Harborage I and Harborage, Inc. Coyne also handled other labor relations matters for Gators employees. When Michelle Johnson left her employment at Gators, Coyne sent her the forms she needed to continue her health insurance.

The record also demonstrates that the fourth factor, common ownership, is met. Harborage, Inc., was the limited partner in Harborage I from 1991 until 1995. As the limited partner, Harborage, Inc., owned a 99% interest in the limited partnership. Therefore, the owners of Harborage, Inc., owned virtually all of Harborage I.

The evidence demonstrates that Harborage, Inc., and Harborage I were a single, integrated operation. The trial court did not err in concluding that Harborage I should be treated as Johns's employer for purposes of Title VII. Furthermore, because Minnesota courts have recognized that principles developed in federal Title VII cases are instructive and may be applied when interpreting the MHRA, Harborage I could be treated as Johns's employer under the MHRA. *See Fahey*, 525 N.W.2d at 572 (principles developed by federal courts in Title VII cases may be applied when interpreting Minnesota Human Rights Act).

## II.

■ Harborage I argues that Johns was precluded from pursuing a Title VII discrimination claim against Harborage I because in her EEOC charge, she named Gators as her employer rather than Harborage I.

■ Ordinarily, a party not named in an EEOC charge cannot be sued in a subsequent civil action. *Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 126 (7th Cir. 1989). The naming requirement serves to notify the charged party of the allegations and allows the party an opportunity to participate in conciliation and to comply voluntarily with the requirements of Title VII. *Id.* But defendants not named in an EEOC complaint may be sued under Title VII where they should have anticipated being named in a Title VII action arising from the complaint.

*Sosa v. Hiraoka,* 920 F.2d 1451, 1459 (9th Cir.1990).

Harborage I had knowledge of Johns's EEOC complaint. Barbara Coyne, Harborage I's human resources director, handled the investigation of the complaint and treated the complaint as a complaint against her employer. Therefore, Harborage I should have anticipated that it would be named in a Title VII suit, and Johns's failure to name Harborage I as her employer in the EEOC complaint does not preclude her from pursuing a Title VII claim against Harborage I.

Harborage I also contends that Johns's claims under the MHRA are time-barred because Johns failed to bring an action against Harborage I within one year after the incident with Long. Harborage I does not dispute that Johns filed a claim with the MHRD within one year after the incident.

Under Minn.Stat. § 363.06, subd. 3 (1996), an MHRA claim for unfair discrimination must be filed in a charge with the commissioner within one year after the occurrence of the discriminatory practice. As is the case with Johns's Title VII claim, Johns's failure to name Harborage I as the employer in the charge filed with the commissioner does not prevent her from pursuing this action against Harborage I. Harborage I had notice of the MHRA claim and should have anticipated being named in an MHRA action.

## III.

■ Harborage I argues that the trial court's conclusion that Harborage I maintained a sexually hostile work environment is not supported by the evidence because Johns admitted that she had no problems with her work environment before the incident with Long and Harborage I took appropriate remedial steps after that incident. Harborage I also argues that Johns may not rely on evidence of incidents between Long and other employees to prove a hostile work environment because she admitted that she was not aware of those incidents.

■ "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson,*

477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). "A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *Id.,* 477 U.S.at 66, 106 S.Ct. at 2405. To establish a sexual harassment claim based on a hostile work environment, the plaintiff must show

> (1) that the conduct in question was unwelcome, (2) that the harassment was based on sex, (3) that the harassment was sufficiently pervasive or severe to create an abusive working environment, and (4) that some basis exists for imputing liability to the employer.

*Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989), *vacated in part on other grounds,* 900 F.2d 27 (4th Cir.1990).

To be actionable under Title VII, sexual harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). Also,

> a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.

*Faragher v. City of Boca Raton,* —— U.S. ——, ——, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993)).

■ Because Johns was not aware of Long's harassment of other female employees at Gators, she may not rely on those incidents to prove that she was subject to a sexually objectionable environment. *See Hirase–Doi v. U.S. West Communications, Inc.,* 61 F.3d 777, 782 (10th Cir.1995) (plaintiff may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment because plaintiff could not subjectively perceive behavior towards others as creating a hostile work environment unless she knew about that behavior). But Johns did not have to rely on evidence of those incidents to prove that she was subject to unwelcome sexual harassment.

> [E]ven a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive relationship for purposes of Title VII liability.

*Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 (2nd Cir.1995); (citing *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405); *see also King v. Board of Regents,* 898 F.2d 533, 537 (7th Cir.1990) (acknowledging that "a single act [of sexual harassment] can be enough" to state a hostile work claim under Title VII).

Long lured Johns into a storage closet where he exposed himself to Johns. When Johns refused Long's request that she remove her shorts, Long forcibly pulled down Johns's shorts, exposing her buttocks. When Johns slapped Long's hand and told him to stop, Long pulled down Johns's shorts again. Long's acts constituted a sexual assault that sufficiently altered the conditions of Johns's employment and created a hostile work environment. The trial court did not err in concluding that Johns was subjected to a hostile work environment.

■ Harborage I argues that Johns's testimony demonstrated that she did not find Long's conduct offensive because she did not leave the closet when Long exposed himself even though there was nothing blocking her path to the door. Instead, Johns engaged in conversation with Long and at some point, told him what kind of underwear she was wearing and showed him her underwear. Johns's testimony, however, does not demonstrate that she was not offended when Long grabbed her. To the contrary, Johns testified that she slapped Long's hand and told him to stop. Even if Johns could have taken steps to avoid Long's conduct, her failure to do so does not demonstrate that she was not offended when the conduct became more severe.

■ Harborage I also argues that there is no evidence to support the trial court's conclusion that it failed to take appropriate remedial measures to stop Long's harassment. Harborage I argues that as soon as it learned about the incident between Long and

Johns, it began an investigation that ultimately resulted in the termination of Long's employment, which was an adequate remedial measure. This argument, however, considers only Harborage I's conduct after Johns became a victim of Long's harassment.

In hostile work environment cases under Title VII, federal courts have imputed

> liability to an employer who anticipated or reasonably should have anticipated that the plaintiff would become a victim of sexual harassment in the workplace and yet failed to take action reasonably calculated to *prevent* such harassment. An employer's knowledge that a male worker has previously harassed female employees other than the plaintiff will often prove highly relevant in deciding whether the employer should have anticipated that the plaintiff too would become a victim of the male employee's harassing conduct.

*Paroline,* 879 F.2d at 107 (citing *Yates v. Avco,* 819 F.2d 630, 636 (6th Cir.1987); *Ross v. Double Diamond, Inc.,* 672 F.Supp. 261, 273 (N.D.Tex.1987))

 An employer is liable for an employee's sexual harassment of another employee "if the employer had 'actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and *adequate* remedial action.'" *Paroline* 879 F.2d at 106 (quoting *Katz v. Dole,* 709 F.2d 251, 255 (4th Cir. 1983)); *see also Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir.1992) (same). An employer must take "prompt remedial action reasonably calculated to end the harassment." *Davis v. Tri–State Mack Distrib., Inc.,* 981 F.2d 340, 343 (8th Cir. 1992).

Before Long assaulted Johns, Harborage I had notice of Long's inappropriate sexual behavior because Long had sexually harassed an assistant manager, Johnson. But Harborage I argues that Johnson took appropriate remedial measures when she orally reprimanded Long. Harborage I contends that the law does not require an employer to fire

a harasser, and, therefore, Johnson's reprimand was sufficient to put Long on notice that his conduct was unacceptable and would not be tolerated.

This argument, however, considers only Harborage I's response to Long's harassment of Johnson. There is evidence that Harborage I should reasonably have known about Long's harassment of several other female employees at Gators and failed to respond to this harassment. Female employees testified that everyone knew about Long's offensive behavior and waitresses had to wear fanny packs to prevent Long from pulling down their shorts.[2] Even if Johnson's response to Long harassing her was an appropriate remedial measure, Harborage I should reasonably have known about Long's harassment of other employees and failed to respond to this harassment. The trial court did not err in concluding that Harborage I knew or should have known of Long's sexual harassment of its female employees but did not take proper remedial action.

### IV.

 A reviewing court will not disturb a damage award "unless its failure to do so would be shocking or would result in plain injustice." *Hughes v. Sinclair Mktg., Inc.,* 389 N.W.2d 194, 199 (Minn.1986). A trial court does not abuse its discretion in awarding damages for discrimination as long as the award works to end illegal discrimination and makes the victim whole. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975).

Harborage I contends that Johns resigned her position at Gators because she believed that Buchanan was retaliating against her for reporting the harassment, not because Long sexually harassed her, and therefore, the evidence does not support the trial court's award of $25,000 in compensatory damages. However, Johns was not awarded damages for her loss of employment. The trial court

---

**2.** Although *Hirase–Doi,* 61 F.3d at 782, precludes Johns from relying on the harassment of other coworkers to demonstrate a hostile work environment, she may rely on this evidence to prove that Harborage I had notice of Long's behavior and negligently failed to take appropriate action to prevent Long from assaulting Johns.

found that she did not prove her retaliation claim.

The trial court awarded Johns $25,000 "for the emotional damages suffered by virtue of the hostile work environment." This award was supported by Johns's testimony concerning her emotional damages, and we must give due regard to the trial court's ability to judge Johns's credibility. *Novack v. Northwest Airlines, Inc.,* 525 N.W.2d 592, 598 (Minn. App.1995). Johns testified that (1) for several weeks after the incident, she had trouble sleeping; (2) her relationship with her boyfriend was affected and she was unable to have sexual relations for three to four months after the incident; (3) for months after the incident, she frequently broke into tears; (4) she is frightened to be approached from behind; (5) she is fearful to go into bars and cannot work as a waitress in a bar; and (6) her relationship with her nine-year-old son was affected by the incident. In light of this testimony, we cannot say that the award of $25,000 in compensatory damages was shocking or results in plain injustice.

### V.

■ Harborage I argues that the trial court's award of $8,500 in punitive damages is contrary to the law and unsupported by the evidence.

■ Punitive damages

are imposed to punish the defendant and to deter him, and others like him, from intentional wrongs and deliberate disregard of the safety or rights of others.

*Rosenbloom v. Flygare,* 501 N.W.2d 597, 602 (Minn.1993). To receive punitive damages, a party must show by clear and convincing evidence that the defendant acted with "deliberate disregard for the rights or safety of others." Minn.Stat. 549.20, subd. 1(a) (1996).

■ The trial court did not find, nor does the record demonstrate by clear and convincing evidence, that Harborage I acted with deliberate disregard for Johns's rights or safety. The trial court found that Harborage I knew, and should have known, of Long's longstanding pattern of harassment but did not take proper remedial action. This is the language of negligence, and punitive damages are not recoverable where the wrongful conduct is merely negligent. *Cobb v. Midwest Recovery Bureau Co.,* 295 N.W.2d 232, 237 (Minn.1980). We reverse the $8,500 punitive damages award.

### VI.

■ Harborage I argues that the trial court abused its discretion in awarding $65,-894.46 in attorney fees and costs. Harborage I contends that even if Johns has a viable claim, an award of $65,894.46 was excessive because a review of the statements submitted by Johns in her motion for fees and costs shows that the majority of the requested fees were redundant and excessive.

■ A trial court's decision on the reasonableness of attorney fees is subject to review under an abuse of discretion standard. *Giuliani v. Stuart Corp.,* 512 N.W.2d 589, 596 (Minn.App.1994). In determining the proper amount of attorney fees to award, a trial court should employ the two-step analysis set forth in *Hensley v. Eckerhart,* 461 U.S. 424, 433–34, 103 S.Ct. 1933, 1939–40, 76 L.Ed.2d 40 (1983). First, the trial court should determine the " 'lodestar' " figure "by multiplying the 'number of hours reasonably expended on the litigation * * * by a hourly rate.' " *Anderson v. Hunter, Keith, Marshall & Co.,* 417 N.W.2d 619, 628 (Minn.1988) (quoting *Hensley,* 461 U.S. at 433, 103 S.Ct. at 1939) (omission in original). Second, the court must consider the results obtained in determining whether to adjust the fee upward or downward. *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1940. When the reasonableness of attorney fees is challenged, the trial court must "provide a 'concise but clear explanation of its reasons for the fee award.' " *Anderson,* 417 N.W.2d at 629 (quoting *Hensley,* 461 U.S. at 437, 103 S.Ct. at 1941).

The record demonstrates that the trial court considered the results obtained, the difficulty of the case, the contingent nature of the results, and the quality of representation in arriving at the figure of $59,586.44 for attorney fees and $6,308.02 for reasonable costs. The trial court made detailed findings that (1) the hourly rates claimed by Johns's counsel were reasonable; (2) Johns's counsel

reduced the amount of fees requested to reflect time spent on unsuccessful claims; (3) there was a great deal of duplication in Johns's attorneys' billing records, and those fees should not be awarded; (4) the case did not present novel or particularly complex legal issues; (5) defendants created "a good deal of the need for [Johns's attorneys] to expend a greater than expected number of hours on this file" by informing Johns, a week before the first scheduled trial, that they were "mistaken" about the employer's identity, and then filing bankruptcy, requiring Johns's counsel to undertake investigation in and outside of bankruptcy court; and (6) Johns's attorneys' efforts substantially improved their clients' recovery.

Because the trial court followed the procedures outlined in *Hensley* and its detailed findings support its award of attorney fees, we cannot say that the trial court abused it broad discretion in awarding Johns $65,-894.46 for reasonable costs and attorney fees.

### DECISION

The trial court properly treated Harborage I and Harborage, Inc., as a single employer. Johns's failure to name Harborage I as a party in the complaints she filed with the EEOC and the MHRD did not preclude her from bringing a discrimination action against Harborage I. Long's sexual assault of Johns was conduct sufficiently severe to alter the conditions of Johns's work environment and create an abusive work environment. Harborage I reasonably should have known about Long's pattern of sexual harassment and reasonably should have anticipated that Long would sexually harass additional employees. Harborage I failed to take action reasonably calculated to prevent Long from sexually harassing Johns. The evidence supports the award of compensatory damages. Because there is not evidence that Harborage I acted with deliberate indifference to Johns's rights and safety, the evidence does not support the punitive damages award. The trial court did not abuse its discretion in awarding attorney fees and costs.

**Affirmed in part and reversed in part.**