Lori JOHNS, Petitioner, Appellant,

v.

HARBORAGE I, LTD., a/k/a America Live, a foreign limited partnership, Defendant,

FPM, Ltd., Defendant,

Jillian's Entertainment Corporation, et al., Respondents.

No. C1–01–2161.

Supreme Court of Minnesota.

July 3, 2003.

Frank Vogl, Patrick B. Hennessy, Best & Flanagan LLP, Minneapolis, MN, for Appellant Lori Johns.

Dan Biersdorf, Biersdorf & Associates, P.A., Minneapolis, MN, for Respondents Harborage I, Ltd., a/k/a America Live, a foreign limited partnership.

Charles E. Gillin, Stephen F. Buterin, Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, MN, for Respondents Jillian's Entertainment Corporation and Jillian's Gator's of Minneapolis, Inc.

## OPINION

HANSON, Justice.

In 1993, appellant Lori Johns was employed as a server at the Gators Bar and Restaurant at the Mall of America. In

1995, she brought a sexual harassment action against Gators under both Title VII of the Federal Civil Rights Act, 42 U.S.C. § 2000(e), and section 363.01 of the Minnesota Human Rights Act (MHRA). At the time of the lawsuit, Gators was one of several bars that were organized by two principals, Charles Greener and Joyce McReynolds, who operated each bar through a combination of several legal entities.

Johns obtained two judgments against one of those entities, a limited partnership named Harborage I, Ltd., but Johns was unable to collect the judgments because Harborage I's assets were liquidated following the sale of Gators to respondent Jillian's Entertainment Corporation. Post judgment, Johns moved to amend her complaint to assert a claim of successor liability against Jillian's. Leave to amend was granted and both parties moved for summary judgment. The district court granted Johns' motion and determined that Jillian's was liable as a successor to Harborage I. The court of appeals reversed, applying successor-corporation liability law. Before this court, Johns argues that a broader concept of successor-employer liability, as recognized by federal courts in Title VII cases, is the appropriate standard. Johns also asserts that Minn. R. Civ. P. 15.01 permits post-judgment, post-appeal amendments to the complaint. We reverse the court of appeals and reinstate the judgment against Jillian's.

When Johns was employed at Gators, it was owned and operated by a combination of limited partnerships and corporations, all of which essentially traced a common source to Greener and McReynolds. All the entities shared the same offices in Dallas, Texas. The entities that operated Gators were:

1. FPM, Ltd., a Texas limited partnership whose general partner was a corporation controlled by McReynolds. FPM was the lessee of the premises and the holder of the liquor license.

2. Harborage I, Ltd., a Texas limited partnership whose general partner was a corporation in which McReynolds was one of three directors. Harborage I was the manager of Gators.

3. Harborage, Inc., a Texas corporation in which McReynolds was one of three directors, provided employees to Gators and issued paychecks.

After a bench trial, the district court found that Gators had violated both Title VII and the MHRA; that Harborage I and Harborage, Inc. were so interrelated that both could be treated as the "employer" of Johns for purposes of Title VII; and that Harborage I was liable to Johns under Title VII and the MHRA. The court determined, however, that FPM was not the employer of Johns and thus was not liable under Title VII or the MHRA. The court ordered judgment in favor of Johns against Harborage I in the amount of $25,000 in compensatory damages and $8,500 in punitive damages. Later, a separate judgment for $65,894.46 in attorney fees and costs was also entered. On appeal by Harborage I, the court of appeals affirmed the findings of the district court in all respects save for the grant of punitive damages. *Johns v. Harborage I,* 585 N.W.2d 853, 864 (Minn.App.1998). The court of appeals awarded Johns' appellate attorney fees of $12,500. The judgments now total $103,394.46.

When Johns began efforts to collect the judgments, she was unable to do so because the assets of Harborage I had been liquidated and the ownership and operation of Gators had been transferred to Jillian's. The transfer of Gators to Jillian's was accomplished by two agreements,

an Asset Purchase Agreement (APA) and a Transition Services Agreement (TSA). Each agreement referenced the transfer of several bars connected with Greener and McReynolds. The APA listed eight different entities as the sellers. FPM, the lessee and liquor licensee of Gators, FPM I, the general partner of FPM, and Main Event, a corporation that held McReynolds' limited partnership interest in FPM, were all listed on the APA. Harborage I was not listed on the APA.

Under the APA, Jillian's assumed all of the "assumed liabilities," defined as "sellers' trade payables up to an amount equal to the saleable inventory * * * plus accrued vacation benefits * * *." Jillian's did not assume any of the "retained liabilities," defined as "all liabilities and obligations, absolute or contingent, known or unknown, due or to become due, now existing or hereafter incurred, of seller and the partnerships other than the Assumed Liabilities." The APA also provided that Jillian's would be indemnified from any adverse consequences caused by any of the retained liabilities.

Although Harborage I was not a party to the APA, it was a party to the separate TSA with Main Event and Jillian's. The TSA stated that Harborage I and Main Event rendered substantial and valuable administrative and support services to the parties to the APA. The TSA noted that Jillian's would require the services of certain employees of Harborage I during the transition of ownership. The TSA also provided that certain "designated employees" of Harborage I would become employed by Jillian's, while other employees of Harborage I, acting through Main Event and Harborage I, would supply support services to the sites involved in the APA during the transition period. Finally, the TSA stated that compensation for those support services would be paid solely to Main Event.

Pursuant to these two agreements, Jillian's took over Gators and operated it exactly as Harborage I (and its related entities) had. The name of the bar and location remained the same, the supervisors, managers, and employees were the same, uniforms, pay, and benefits remained the same, and the bar used the same décor, menu, furniture, and equipment.

Johns moved to amend her complaint to add Jillian's as a defendant. That motion was granted and Johns then moved for summary judgment, as did Jillian's. In its cross-motion for summary judgment, Jillian's did not challenge Johns' factual assertions but rather concentrated on three key points:

1. Harborage I was not a party to the APA by which Jillian's acquired Gators and the TSA was the only explicit business transaction between Jillian's and Harborage I.

2. Jillian's could most properly be considered a successor to FPM, which was a party to the APA but had been found not to be liable to Johns.

3. Jillian's neither explicitly nor implicitly assumed any of the debts or obligations of Harborage I.

The district court, after considering these contentions, found in favor of Johns. Specifically, the district court found that: (1) "the effect, if not the intent" of the APA was to block Johns' efforts to collect a valid judgment; (2) the APA made clear that Jillian's was aware of the "vital role" of Harborage I in the operation of Gators; (3) the same management personnel remained following Jillian's purchase; and (4) Jillian's entered into the agreements with full knowledge of Johns' judgments against Harborage I. The district court

ruled that Jillian's was liable as a successor.

The court of appeals reversed on a number of grounds. It held that (1) Rule 15.01 of the Minnesota Rules of Civil Procedure did not permit Johns' post-judgment amendment of the complaint; (2) garnishment was the only method by which Johns could assert a successor liability claim against Jillian's; and (3) the district court erred as a matter of law in finding that Jillian's was liable as a successor corporation. *Johns v. Harborage I*, 645 N.W.2d 761, 762 (Minn.App.2002) (hereinafter *Johns II* ). Johns appeals on all grounds.

## I.

 Johns contends that the court of appeals erred in holding that Rule 15.01 of the Minnesota Rules of Civil Procedure does not permit a post-judgment, post-appeal amendment of a complaint. Generally, the decision to permit or deny amendments to pleadings is within the discretion of the district court and will not be reversed absent a clear abuse of discretion. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993); *LaSalle Cartage Co., Inc. v. Johnson Bros. Wholesale Liquor Co.*, 302 Minn. 351, 357–58, 225 N.W.2d 233, 238 (Minn.1974). The court of appeals did not focus on an abuse of discretion standard but held, as a matter of law, that Rule 15.01 does not permit amendment of the complaint after judgment has been entered and the appeal is finalized. *Johns II*, 645 N.W.2d at 765.

Rule 15.01, which is substantively identical to the federal rule, reads in relevant part:

[A] party may amend a pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

Minn. R. Civ. P. 15.01. Jillian's relies on a number of federal cases that are discussed in Wright and Miller's *Federal Practice and Procedure* and hold that once judgment is entered, the court cannot allow amendment of the complaint. *See* 6 Charles Alan Wright, Arthur R. Miller, & Mary Kaye Kane, *Federal Practice and Procedure* § 1489 (2d ed.1990). But these cases generally deal with the situation where the proposed amendment represents a challenge to the judgment. This is not true here. Johns does not challenge the judgment, but seeks to enforce it against a successor party.

As such, this case closely parallels the recent United States Supreme Court decision in *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 120 S.Ct. 1579, 146 L.Ed.2d 530 (2000). There, the district court allowed a third-party complaint to be amended to add the sole shareholder as a third-party defendant after judgment had been entered on the third-party complaint against the corporation. *Nelson*, 529 U.S. at 463, 120 S.Ct. 1579. The amendment was sought because the judgment creditor could not collect from the corporation. *Id.* at 462–63, 120 S.Ct. 1579. Although the Court reversed the summary judgment entered against the sole shareholder on due process grounds, because his liability had been determined without an opportunity to be heard, the Court allowed the amended complaint to stand and remanded to allow the sole shareholder to present a defense. *Id.* at 472, 120 S.Ct. 1579.

 The Supreme Court, therefore, recognized that there are situations in which it is permissible to amend a complaint after entry of final judgment. Such a view is consistent with the statement of this court that "[u]nder our modern system of pleading and practice the amendment of pleadings is liberally allowed even after judgment has been entered." *Crum v.*

*Anchor Cas. Co.,* 264 Minn. 378, 389, 119 N.W.2d 703, 710 (1963).

■ Jillian's argues alternatively that the amendment was impermissible because the district court lacked subject-matter jurisdiction to grant leave to amend. Jillian's asserts that the district court's jurisdiction ceased with the 1997 entry of judgment or, alternatively, with the court of appeals' affirmance in 1998. However, the cases relied upon by Jillian's are inapposite. One stands only for the proposition that a district court does not retain jurisdiction to amend an order while an appeal from that order is pending. *Marzitelli v. City of Little Canada,* 582 N.W.2d 904, 906–07 (Minn.1998). Another merely states that a district court has no jurisdiction to reopen a judgment to allow a party to argue alternative grounds to challenge it after affirmance on appeal. *Mattson v. Underwriters at Lloyds of London,* 414 N.W.2d 717, 718 (Minn.1987). We conclude that the district court retained jurisdiction to enforce the final judgment after appeal because such enforcement is "independent of the underlying [appellate] decision" and would not "modify the underlying [appellate] decision in any way." *Kellar v. Von Holtum,* 605 N.W.2d 696, 700 (Minn.2000).[1]

## II.

The court of appeals concluded that Johns was barred from pursuing her claim against Jillian's under the amended complaint because the appropriate remedy was garnishment under Minn.Stat. § 571.71–.932 (2000). *Johns II,* 645 N.W.2d at 765. The court of appeals also held that Johns' failure to file a supplemental complaint based on Jillian's denial of a garnishment summons results in the discharge of Jillian's from any liability. *Id.* We conclude that garnishment was not the exclusive or even an appropriate remedy to enforce the judgment. Jillian's apparently agrees because it did not argue this issue before us.

Under Minn.Stat. § 571.73, subd 1, the only property reached by garnishment is the disposable earnings indebtedness, money or property of the debtor in the garnishee's possession. Minn.Stat. § 571.73, subd. 1 (2002). In other words, a garnishment summons could only be used to enforce Jillian's liability to Harborage I. Because Jillian's had no liability to Harborage I, garnishment was not an appropriate procedure to enforce Johns' judgments against Harborage I. Accordingly, we conclude that Johns was not required to file a garnishment action to pursue collection of her judgments and that the failure of Johns to file a supplemental complaint does not bar her claim against Jillian's.

## III.

■ We now turn to the issue at the heart of this case—whether Jillian's can be considered a successor employer for purposes of enforcing the judgment obtained against Harborage I. Because this appeal is from summary judgment, our review is twofold, to determine (1) whether there are any genuine issues of material fact and (2) whether the district court erred in its application of the law. *Odenthal v. Minnesota Conference of Seventh–Day Adventists,* 649 N.W.2d 426, 430 (Minn. 2002).

In holding that Jillian's did not have successor liability, the court of appeals re-

---

**1.** At oral argument Jillian's acknowledged that Johns could have started a new action against Jillian's alleging successor liability for the judgment against Harborage I, and that Johns' choice to pursue the claim instead by amendment to the original complaint did not prejudice Jillian's.

lied on Black's Law Dictionary and on Minnesota successor-corporation law. Black's defines a successor as "A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation." *Johns II,* 645 N.W.2d at 766 (citing Black's Law Dictionary 1446 (7th ed.1999)). Minnesota successor-corporation law, as codified by statute, provides that "The transferee is liable for the debts, obligations and liabilities of the transferor only to the extent provided in the contract * * *." Minn.Stat. § 302A.661, subd. 4 (2002); *see also J.F. Anderson Lumber Co. v. Myers,* 296 Minn. 33, 40–41, 206 N.W.2d 365, 370 (1973) (holding that when one corporation transfers its assets to another, the receiving corporation is not responsible for debts of transferor unless it agrees to assume these debts).

 Jillian's did not have successor-corporation liability under Minnesota's corporate law because Jillian's carefully defined the liabilities it would assume, and debts such as Johns' judgments were not among them. However, the court of appeals did not go far enough in its analysis. In addition to successor-corporation liability under Minnesota corporate law, a separate and broader concept of successor-employer liability has been recognized in federal decisions under Title VII. Because

Title VII provides an alternate basis for the judgments in this case, the federal doctrine of successor-employer liability must be considered.[2]

### A. The Federal Doctrine of Successor–Employer Liability

The federal doctrine of successor-employer liability was first recognized in the context of the Labor Act. *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 544, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). The Supreme Court was required to determine whether provisions of a collective bargaining agreement survived a merger. *Id.* at 546, 84 S.Ct. 909. The Court held that the purchaser was obliged to consider the seller's bargain. *Id.* at 550–51, 84 S.Ct. 909. In so holding, the Court noted that "substantial continuity of identity in the business enterprise" was a determinative factor. *Id.* at 551, 84 S.Ct. 909.

The Supreme Court expanded the recognition of successor-employer liability under the Labor Act in *Golden State Bottling Co., Inc. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973). There, the question was whether a bona fide purchaser who acquires and continues the business with knowledge of a predecessor's unfair labor practices is obliged to implement the terms of NLRB orders to rectify those practices. *Golden State,* 414 U.S. at 170, 94 S.Ct. 414. The Court reasoned that

**2.** State courts have concurrent jurisdiction over Title VII claims. In *Yellow Freight System, Inc. v. Donnelly,* 494 U.S. 820, 821, 110 S.Ct. 1566, 108 L.Ed.2d 834 (1990), the Court concluded that Congress did not divest the state courts of their presumptive concurrent authority to adjudicate federal claims under Title VII. In *Felder v. Casey,* 487 U.S. 131, 139, 147, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), the Supreme Court further instructed that a state court's enforcement of federal civil rights laws should be done in light of the "purpose and nature" of the law and that a state court may not impose procedural rules that place conditions on "those who [seek] to vindicate their federal rights in state court * * *." Accordingly, state courts acting in Title VII cases are to apply federal substantive law and may not enforce any state procedural laws that would conflict with the "remedial objectives" of the federal right or would "frequently and predictably" produce outcomes different from that which would be commonplace in a federal court. *Felder,* 487 U.S. at 138, 108 S.Ct. 2302 (dealing with the so-called "reverse-*Erie* " considerations in a 42 U.S.C. § 1983 action commenced in state court).

such liability was not unfair to a purchaser who had notice of the orders, stating:

> Since the successor must have notice before liability can be imposed, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices.

*Id.* at 185, 94 S.Ct. 414 (citations and internal quotations omitted).

Although the Supreme Court has not addressed the doctrine of successor-employer liability in a Title VII case, federal circuit courts have uniformly held that the same doctrine is appropriate under Title VII. The first case to address the issue was *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1090–91 (6th Cir. 1974), where the court concluded:

> We are of the view that the considerations set forth by the Supreme Court in these three cases as justifying a successor doctrine to remedy unfair labor practices are applicable equally to remedy unfair employment practices in violation of Title VII.

> \* \* \* \* \* \*

> Title VII was molded, to a large degree, after the Labor Act, supra. Indeed, the relief provisions of Title VII were derived from an analogous provision in the Labor Act.

> \* \* \* \* \* \*

> Title VII's ban against unfair employment practices is not mutually exclusive with the Labor Act's prohibition of unfair labor practices. The two may be used as tools to remedy the same conduct. \* \* \* [T]he emphasis that both Acts place on extending protection to and providing relief for the victims of prohibited practices is sufficient, in our

view, to warrant imposing liability on a corporate successor for Title VII violations of the predecessor company.

(Citations omitted.) *See also EEOC v. G–K–G, Inc.*, 39 F.3d 740, 747–48 (7th Cir. 1994); *EEOC v. Vucitech*, 842 F.2d 936, 945 (7th Cir.1988); *Slack v. Havens*, 522 F.2d 1091, 1094–95 (9th Cir.1975); *In re National Airlines, Inc.*, 700 F.2d 695, 698 (11th Cir.1983); *Dominguez v. Hotel, Motel, Restaurant & Misc. Bartenders Union Local # 64*, 674 F.2d 732, 733 (8th Cir. 1982); *Trujillo v. Longhorn Mfg. Co. Inc.*, 694 F.2d 221, 224–25 (10th Cir.1982).

Before this court, Jillian's has suggested that the federal successor-employer liability rule is dependent on the underlying state law and can be no broader than successor-corporation liability under state law. This assertion misperceives the basis for the federal rule, which does not depend on state law but is a "special federal common law doctrine of successor liability" that is a "departure from the more limited approach of the common law \* \* \*." *G–K–G, Inc.*, 39 F.3d at 748.

■ The court of appeals decision does not discuss federal successor-employer liability. It focuses, instead, on the method used to transfer the assets, which is only relevant to state successor-corporation liability. This led to the erroneous conclusion that Jillian's cannot be a successor to Harborage I because Harborage I was only a party to the TSA, not to the APA, which was the agreement that transferred the assets of Gators to Jillian's. *Johns II*, 645 N.W.2d at 766. Under the federal doctrine of successor-employer's liability, the method of transfer of assets is not determinative of whether a successor has liability. *See Golden State*, 414 U.S. at 182, n. 5, 94 S.Ct. 414 (refusing to distinguish between mergers or consolidations

and asset purchases as long as there is continuity in the employing industry).

We conclude that the federal doctrine of successor-employer liability applies to Johns' Title VII claims. Because these Title VII claims are identical to the claims made by Johns under the MHRA, and the judgments may be sustained solely on the basis of Title VII, we decline to rule on whether a similar successor-employer liability doctrine is available under the MHRA.

### B. The Grant of Summary Judgment

Having determined that the federal doctrine of successor-employer liability applies, the question becomes whether liability under that doctrine exists as a matter of law, based on undisputed facts, or whether there are genuine issues of material fact that preclude summary judgment.

Most of the federal successor-employer liability cases do not arise on summary judgment. In fact, genuine issues of material fact may often exist because, as stated in *MacMillan:* "Each case, however, must be determined on its own facts. What is required is a balancing of the purposes of Title VII with the legitimate and often conflicting interests of the employer and the discriminatee." 503 F.2d at 1090–91. But, there are cases where the facts are undisputed and the successor employer liability doctrine has been applied in a summary-judgment context. For example, in *G–K–G, Inc.*, the district court granted summary judgment on the issue of successor-employer liability. 39 F.3d at 747. The court of appeals affirmed, concluding that there were no fact disputes on the

elements of continuity of business and notice. *Id.* at 748.

Jillian's has not contested the underlying facts or argued that there are genuine issues of material fact. Instead, it has focused on alternative legal theories. Thus, we may consider the facts to be undisputed and determine whether, as a matter of law, Jillian's is a successor-employer under Title VII.

Continuity of business is a key factor in determining whether an employer is a successor-employer for liability purposes. *John Wiley & Sons, Inc.*, 376 U.S. at 551, 84 S.Ct. 909. Here, substantial continuity is shown by the undisputed facts. Gators is the same restaurant in the same location run by the same people. The continuity of business test should properly focus on the entire business of Gators, not just on one or more of the legal entities that were created to operate that business. Although Greene and McReynolds were free to unbundle the business into as many legal entities as they choose, the policies that underlie Title VII cannot be avoided by attempting to confine the "employer" function to a limited entity that has no purpose independent of the business as a whole. Greene and McReynolds were only able to operate Gators by joining the efforts of all of the related entities.[3] By the combination of the APA and TSA, Jillian's acquired control of all of the entities, or portions of entities, that operated Gators. We agree with the district court that continuity of the business has been established as a matter of law.

Similarly, Jillian's does not contend that it did not have notice of Johns' judgment against Harborage I. Indeed, the TSA re-

---

**3.** Jillian's argument that it is a successor only to FPM fails for this reason. Although we do not fully understand the district court's decision to not enter judgment against FPM, we do not regard this as fatal to successor-employer liability because, for Title VII purposes, the judgment against Harborage I implicates the entire business of Gators, to which Jillian's succeeded.

quired Jillian's to employ Harborage I's human resources director, who was actively involved in the litigation with Johns. Jillian's was therefore charged with notice of the judgments and had an opportunity to protect itself in negotiating the price and the terms of indemnification. Indeed, the APA does provide indemnity to Jillian's from "any adverse consequences [Jillian's] may suffer resulting from, arising out of, relating to, in the nature of, or caused by any retained liability." We agree with the district court that notice has been established as a matter of law.

We reverse the decision of the court of appeals and reinstate the judgments of the district court against Jillian's.

Reversed.

GILBERT, Justice (dissenting).

I respectfully dissent from the majority's opinion and would affirm the court of appeals. The majority's conclusion that Jillian's is a successor employer represents a major departure in our jurisprudence and produces an unfair result. Moreover, this decision creates a dramatic new risk for those who are either acquiring ongoing business entities or hiring employees of a separate management company in Minnesota. Likewise, it creates an entirely new avenue of responsibility for the disclosure and estimation of liabilities and contingent liabilities of the selling entity and affiliates and an unwieldy due diligence responsibility for the purchaser and those professionals representing purchasers of ongoing business entities.

The majority correctly points out that Jillian's did not have successor corporate liability under Minnesota corporate law. All of the companies here were properly registered to do business and they carefully defined the liabilities and debts they wanted to assume and appellant's debts were not among those. However, the majority goes on and applies a "separate and broader" successor-employer liability doctrine that has emerged in Labor Act cases. The application of this federal doctrine of successor-employer liability here is contrary to the law of this case, as found by the district court, and is contrary to the federal law controlling successor-employer liability for purposes of the Labor Act.

FPM was a Texas limited partnership that was a lessee of the restaurant, was the holder of the restaurant's liquor license and owned all of the furniture, fixtures and equipment, and inventory. Harborage I, Ltd. managed the restaurant. In deciding the appellant's underlying sexual harassment claim, the district court found that Harborage I could be treated as an employer under Title VII. The court then entered judgment in favor of appellant against Harborage I in the amount of $33,886.99. At the same time, the court entered the following factual findings: "Defendant FPM, Ltd., while sharing some common ownership, was only the lessee and holder of the liquor license at Gators, but not involved in management or labor relations to a degree sufficient to be considered plaintiff's employer." Accordingly, the court ordered and adjudged "that [appellant] is entitled to recover nothing from the defendant FPM, Ltd." Thus, the court absolved FPM of any wrongdoing in appellant's sexual harassment case, and FPM had absolutely no employment responsibility or liability whatsoever in favor of the appellant in this case. Subsequently, Jillian's and FPM entered into a purchase agreement for the restaurant's assets. As part of the agreement, Jillian's, as purchaser, did not assume or have any responsibility with respect to any retained liabilities.

Notwithstanding the fact that FPM was absolved of any responsibility for this wrongful employment conduct and money judgment, now, through the back door, appellant is obtaining a money judgment against Jillian's. The majority now deems Jillian's "a successor employer" despite the fact that Jillian's purchased the operating assets of the restaurant from FPM, and merely hired employees of Harborage I, a separate management company. The appellant is basically accomplishing indirectly what she could not accomplish or prove directly. Now, we have an innocent bona fide third-party purchaser of FPM's assets obligated for the judgment against Harborage I. The district court buttressed this result by stating, "If Jillian's is an innocent party here, its remedy lies against the sellers." The irony in this is that even if Jillian's, as the successor in interest, had performed its preacquisition due diligence investigation and had reviewed the underlying judgments and decrees and decisions from the court of appeals, it would not have had any possible means of ascertaining that by purchasing assets from FPM, Ltd. it was in any way responsible for the liability of Harborage I. The foundation for the majority opinion made at the district court is full of fault lines that should not be expanded upon by this court.

The district court embarked upon some creative reasoning to reattach liability to a purchaser of assets (Jillian's) 3 years after it had absolved the seller of the assets (FPM) of any responsibility in regard to appellant's claim. First of all, the court acknowledged that Harborage I was not a party to the asset purchase agreement. However, in essence, it brought FPM back into the picture, in part, because the asset purchase agreement "sets out the allocation of the seller's purchase price, indicates that nearly $3.7 million of the total purchase price was allocated to management fees. These fees were, until shortly before the sale transaction, payable to Harborage I pursuant to its agreement with the selling entities." This conclusion is misleading because only a small portion of the management fees was allocated to FPM. Of the total amount allocated to management fees, only $352,491 was allocated to FPM. The balance was allocated to four other separate entities that had nothing to do with the appellant or FPM, the actual seller of the assets.

The district court then went on to link this new liability to the asset purchasers (Jillian's) because of "other ties between Harborage I, Ltd. and the selling entities." This linkage related to insurance and certain identified benefit plans. The district court then reinforced its reason in that "the Harborage I, Ltd. principals benefited substantially from this sale, while avoiding a valid judgment debt to [the] plaintiff." This reasoning is problematic for a number of reasons. It ignores the separate, valid and legal existence of the various entities. Moreover, this rationale is used to pierce the separate independent veil of each entity because "the principals benefited" from the sale. A new legal theory has been created in Minnesota, which appears to abolish the distinction between separate legal entities as long as the principals of the various entities benefited from the transaction. Again, the majority fails to cite to authority for this major new proposition.

Furthermore, this new legal theory ignores the fact that these separate companies were long in existence and were not set up to defraud the appellant or anyone else. Appellant was only hired by, worked for, and harmed in the employment context by Harborage I. Now, long after the appellant has left the employment and lost in the first go-around in court against FPM, the district court has successfully bundled up all of these separate business

entities to make each one liable for the debts of the others. By concluding that Jillian's is liable to the appellant as a successor-employer, the district court ignored the fact that FPM was only the seller of these assets and had been previously absolved of any responsibility by this same district court and now 3 years after the initial decision, attributes liability to "the Jillian defendants."

Moreover, in using the admittedly separate and broader concepts of successor-employer liability under the Labor Act, the majority belies what actually occurred in the federal cases cited for this proposition. The federal cases establishing successor-employer liability either involved a merger, a purchase or a consolidation of businesses. *See John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 548, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (holding "that the disappearance by merger of a corporate employer which has entered into a collective bargaining agreement with a union does not automatically terminate all rights of the employees covered by the agreement, and that, in appropriate circumstances, present here, the successor employer may be required to arbitrate with the union under the agreement."); *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 180, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (holding that a bona fide purchaser may be considered in privity with its predecessor).

In contrast, Harborage I, the wrongdoer in the employment case, was not a party to the asset purchase agreement between FPM and Jillian's. Harborage I was a party to a separate "Transition Service Agreement." As part of that agreement, Jillian's agreed to hire the employees of Harborage I on an at-will basis and agreed that other employees of Harborage I would supply support services during the transition period. And while I agree with the majority that the federal courts have

refused "to distinguish among mergers, consolidations, and purchases of assets," they have never bundled together an exonerated seller of assets with a separate management company found to have violated employment laws. Under the "Transition Service Agreement," Harborage I did not sell, merge or consolidate its business with Jillian's, nor did Jillian's purchase any of Harborage I's assets. Harborage I merely allowed its employees to be hired by Jillian's. Accordingly, these federal cases do not support the majority's conclusion that Jillian's is a successor-employer.

Our fact situation differs from the federal cases cited in another material respect. One federal case cited had a collective bargaining agreement, which the United States Supreme Court held the purchaser was obligated to consider. *John Wiley & Sons, Inc.,* 376 U.S. at 551, 84 S.Ct. 909. In addition, in *Golden State,* there was an NLRB order to rectify unfair labor practices. 414 U.S. at 170, 94 S.Ct. 414. This involved the nature of injunctive, equitable relief to remedy the continuing unfair labor practices.

I acknowledge that the appellant's underlying claim is a very serious claim. However, there is nothing in law or in equity that would foist this liability of Harborage I onto Jillian's. Neither entering the Transition Services Agreement with Harborage I nor purchasing separately the assets of FPM under these facts, makes Jillian's a culpable, successor employer. The successor-employer doctrine in the federal common law is an equitable doctrine and has only been in force when there are equitable principles supporting that. In this case, there are no equitable or legal principles whatsoever supporting holding Jillian's liable for Harborage I's judgment as a successor-employer. There in effect has been an effort to accomplish a

preordained result notwithstanding the existence of separate entities while ignoring the fact that FPM was absolved of any employment responsibility initially and that Jillian's is not a successor in interest of the wrongdoer because it did not purchase any assets of the wrongdoer.

I also dissent from the majority's conclusion that under these facts, the post-judgment amendment of appellant's complaint is permissible under Minn. R. Civ. P. 15.01. This conclusion allows the post-judgment, post-appeal amendment of appellant's complaint, which has the effect of adding a judgment debtor to a final judgment that has been in place for almost 3 years. The only citation to Minnesota authority in the majority opinion relating to an amendment of a complaint under these facts is to *Crum v. Anchor Casualty Co.*, 264 Minn. 378, 119 N.W.2d 703 (1963). While we have stated that under our modern pleading system and practice amendments of pleading is liberally allowed even after a judgment has been entered, this proposition is supported only by a citation to Rules of Civil Procedure 15.01 and 15.02. *Id.* at 389, 119 N.W.2d at 710. However, I find no authority in Rules 15.01 and 15.02 to support an amendment to the complaint under these facts. Rule 15.02 allows such amendments for issues not raised in pleadings if they were tried with consent and then the amendment can conform to the evidence, even after the entry of judgment. Minn. R. Civ. P. 15.02. That is not what has happened in this case and, in fact, the exact opposite has happened. This legal patchwork is being done without consent and long after the final judgment has been entered and is contrary to the law of the case as found by the district court judge.